Good morning, and may it please the Court. My name is Court Walker, and I represent William Anderson and Danny Sue Jernigan, who are Chapter 13 clients that are simply trying to completely cure their mortgage loan default with the Hancocks under their Chapter 13 bankruptcy plan. Your Honors, under a natural application of this Court's decision in N. Ray Litton, a Chapter 13 cure enables Anderson and Jernigan to restore the non-default terms of their contract with the Hancocks through the cure provisions of their plan. For three reasons, the District Court and the Bankruptcy Court below should be reversed. Number one, the plain language of the statute regarding a cure of default is expansive. 1322B, 3, and 5 provide that a Chapter 13 plan can cure or waive any default. When Congress uses the words any default, by definition, that must mean that there is the ability to cure more than one default or more than one type of default. The second point, Your Honors, is that Anderson and Jernigan are curing the terms of the loan and not modifying the terms of the loan. The third point is that, as this Court stated in N. Ray Litton, when Judge King wrote for the majority. It's a legal question. I think this is more of a factual question. I think everybody agrees on the principles under the Bankruptcy Code, what you can do. It seems to me this document, the issue as I see it, and then at least it would help me if you were to speak to it, is whether the document has two avenues to go on a default. You can go and raise the interest rate or you can accelerate and foreclose. If they had raised the default and they had raised the interest rate, and after they raised the interest rate, the borrowers paid, continued paying for 10 years at the higher rate, there could be no foreclosure on that. The default was cured by the increase. It went up to 7 percent with the new payment, but all other terms remain applicable. You would agree with that, wouldn't you? Under the terms of the contract, yes, Your Honor. Yes. So had they raised the rate and made the payments thereafter for 10 years, the default that raised the rate is cured by the terms of the document. That's the only remedy under that second provision. Your Honor, I would say that the way that you're using cure there is not the way that the Bankruptcy Code in Chapter 13 uses cure. I want to get to factual matter first. In other words, that is a novation. There's a new contract in place with a 7 percent payment with all the other terms. They default, they raise the rate, and now the borrower makes the payments at the higher rate for 10 years. You could pay it for the rest of the mortgage. It would all be fine, right? But there's no new contract. But otherwise, yes, Your Honor. Why is it? It's a new term of a contract. A novation includes either a new contract or a new term of a contract. Well, there's one contract, and it has an election of two consequences. Stick with me. I want to know what's the consequence if, under this hypothetical, there was a default in April, the lender raised the rate to 7 percent and the payment accordingly, the borrower then pays the increased rate and continues paying it to the end of the mortgage. Tell me what happened in that case when they made that change. In the hypothetical. In your hypothetical, Your Honor, yes, there was a default, and there was a consequence of the default, and that was the election. And there was no further consequence after they raised the rate, right? Under your hypothetical. Absolutely, Your Honor. So it's solved. There was, cure whatever you want, the default was put away by the increased rate under my hypothetical. Well, under your hypothetical, I would say that the terms of the contract then are simply being performed and carried out. Sure. But, well, the contract is changed because of the default. The contract says if you default, it goes up to 7 percent. And so the borrower says, okay, I agree, I defaulted, it went up to 7 percent and pays the mortgage off for 25 more years. But Your Honor, there's no default at that point. At 10 years, there's no default, is there? There's a slight difference, though, I believe, Your Honor, from the hypothetical on the facts here. No, I don't want to go to the facts here. I want to get an understanding of the document under my hypothetical. Well, in your hypothetical, it sounds like there is an automatic interest rate increase when there is a default. Oh, it's triggered. The guy says you have to raise, he has to elect the first provision on the second. He elected the second. There's a default. The lender says, I'm going to go under number two, you raise the interest rate, and the borrower says, okay, and he pays the higher rate for the rest of the mortgage. Tell me what the consequence in that case is. Well, the consequence is that under the terms of the contract, they're performing. It doesn't mean that the default. What happened to the default? The consequence of default, the stain of default, is still there, it remains there through the life of the loan. Why does it remain there? The default led to a consequence which cured the default. But that didn't cure- You could never foreclose. Two years later, you couldn't foreclose, could you, on that default? Because of the election that was made. Yes, Your Honor. But- Why doesn't subsection B5 indicate that the cure of the default is your ability to continue to maintain payments? But it's not a modified- I mean, but you may maintain payments under a modified interest rate under the terms of the contract. But I don't understand why that- the phrase that's hanging me up is the phrase maintenance of payments, I mean, from the standpoint of your position. The term maintenance of payments indicates that the curing of the default is the fact that you can continue to maintain payments. There's no foreclosure. That's got to be the cure here. And I'm trying to give, you know, meaning to all these different sections. And you start with a presumption that you can't modify the terms of a secure interest that in real property, that's the debtor's principal residence, a bankruptcy court or bankruptcy plan can modify everything, modify the rights of holders of secured claims. But it begins, this whole section begins with the fact that the one thing you can't modify or the plan can't modify is a claim secured by interest in the real property that's the debtor's principal residence. And if you say, well, we're going to ignore the increase in interest from 5% to 7%, then you have modified the plan in a way that B-2 says you can't modify. And you say, oh, well, no, the concept of a cure allows you to modify the contract and continue the interest rates at 5%. But I'm not sure that's what a cure means. It seems to me a cure probably means that you get deceleration and a chance to follow through with the contract at a 7% interest rate. And that's the cure. It's not a modification of the terms of the contract. It's a chance to have your payments under the contract decelerated. And that seems to me to make sense of 2, 3, and 5. You've got to make sense of all three of those. Thank you, Your Honor. To respond to a few things that you mentioned there, first of all, all we're looking to is the definition of a cure that this Court stated in the Litton case, which said that a cure merely reinstates a debt to its pre-default position or it returns the debtor and creditor to their respective positions before the default. There's no issue here that the default had to- Well, even to that formulation, it would still be the respective positions would still be the contract. A non-default status of the contract, Your Honors. And the non-default status of the contract is the 5% interest rate. The only reason that there's a 7- How can you just overlook the fact of the default and the fact of the bankruptcy? That's what the whole contract was designed to anticipate. And the interest in these mortgage contracts are designed to compensate the creditor for the risk that he's running. And the creditor gives up a lot because he doesn't have an alternative use of his money and you have access to his money. And so you have an interest rate to cover the risk. And so you bargain for an increase from 5% to 7% in the event of a default. And that's basic economics because once you're in bankruptcy and once you're in default, you become more of a risk. And if you become more of a risk, the interest rate is going to rise. And that's what the contract anticipated is that somebody becomes more of a risk, they pay a higher rate of interest. That's just basic econ. I'm sorry, Your Honor. No, no. I appreciate your patience, but I don't- I'm trying to make sense of these different provisions and I can't make sense of them particularly it seems to me to gut B-2 by not giving effect to the terms of the contract. But Your Honor, the contract also has the parties bargaining for acceleration of the loan as a consequence of default. And the cure under 1322B, both 3 and 5 allow for the deceleration of the loan. And so all it's doing is saying that what's the consequence of default? If it's acceleration, the loan can be decelerated. What's the consequence of default here? Why isn't that deceleration a cure? It is a cure. That's a pretty big break. It is a cure, Your Honor. And that's what this court said in Litton. The deceleration is a cure. And in Litton, deceler- Why aren't you out of luck? I'm sorry, Your Honor. The deceleration is the cure. Why aren't you out of luck? You're saying the cure is to put me back at 5%. And the problem I indicated that I had with it was it abrogated, I thought, the terms of the contract that seemed to undermine the presumption that B-2 established that this formal secured interest in a residence couldn't be modified. And it didn't make- and it left the term maintenance of payment almost superfluous in B-5. And so I'm having practical problems because of the increase in risk. I'm having problems from the standpoint of B-2. I'm having problems from the standpoint of B-5 with your position. But, Your Honor, I think it goes back to the difference between the definition of modify and cure. And deceleration- Your Honor, in the Litton case, deceleration was what was at issue. The loan had been accelerated. And so this court said that the cure merely reinstates the debt to the pre-default position of the parties. In the case that we're talking about here, there's both. There's acceleration and there is the imposition of the default interest rate. And when the statute says that any default can be cured, any default, it's not talking about just one. It's not talking about just acceleration. It's not talking about just the most recent default. The statute is expansive in its language when it says the curing of any default. We're not asking for an interest rate that was never contemplated. You deal with the language in B-5, which seems to equate the curing of a default with the ability to continue maintaining payments. Your Honor, those terms aren't one and the same. They can be read consistently, but they don't mean the same thing. The meaning of a cure, again, is to reinstate a debt to its pre-default position. That's what happens when there's deceleration. And in a Chapter 13 plan, that deceleration is recognized at month number one of the plan. For the five years of the Chapter 13 plan, the loan is not recognized as being in an accelerated status. And so when you come to what Anderson and Jernigan are asking for, it's only that this default interest rate be reinstated to the original non-default terms of the contract and that be recognized at month number one in the plan. And then they are making the maintenance of payments. They are making ongoing payments. That doesn't account for the fact that the entire negotiation was to compensate the creditor in the event that the other party to the contract, your client, presented a heightened risk. If we rule in your way, it's going to be bad for people who want to take out mortgages because the creditors are going to say, even if there's a default, I can't raise the rate. I better cover myself by establishing a higher rate to begin with. In other words, what you do is you load adverse effects on the debtor up front. But if we interpret these sections here and you disallow creditors from having increased interest in the event of increased risk, the creditors are going to cover that one way or another. They're not just going to give it away and they're going to be more onerous terms putting these contracts at the outset. And I don't see your position as a pro-debtor position in terms of the adverse effects that are going to result. Your Honor, could I have one comment or I can save it for rebuttal? Anyway, I'm taking a lot of your time. Do you have something else to add? I'm sorry. So just to respond in one way to that. I want to be clear that in terms of that default interest rate and the curing of the loan terms, everyone agrees that that higher interest rate for the pre-petition arrears applies. Absolutely. And Anderson and Jernigan are paying, through the course of their Chapter 13 plan, an amount on those arrears that incorporates that default interest rate for those months in time when it applied. So we're not asking that the default interest rate be somehow wiped out or written out of the contract. We're only saying that, yes, for the pre-petition arrears before the case was filed, absolutely, the default rate of interest applies for those months in which it was imposed. But if the purpose of a cure on a Chapter 13 plan is to bring the loan back into good standing, all they're asking for— That assumes the whole question. Well, but, Your Honor, I think that that goes to the definition of what a cure does. I mean, the whole question is, through the Chapter 13 plan— That's what the question is. Both the bankruptcy and district court ruled against you on that question. And I'd love to talk about those cases more in detail. I mean, the rulings below more in detail. And I'm happy to do that now or on rebuttal, Your Honor. All right. Thank you. Got some rebuttal. Thank you. Mr. Nodale. Yes, sir. Thank you. Your Honor, I actually—your comments and questions are basically my notes. I just kind of went through them one by one, so there's no point in repeating. But to say that I do think that it's very restrictive. This is a residential loan. There's obviously clearly a means of curing the default through filing a proof of claim being paid over the life of the plan. They maintain— Does it be—doesn't—when you combine Sections B-2 and B-5, B-2 says a plan may not modify the terms of a secured loan that—where the security interest is in the residence. Yes, sir. And then you go down to B-3 and it talks about a plan may provide for the curing of or waiving of any default. And then I thought the language in B-5 equated the ability to maintain payments, which is deceleration, with cure. And that seemed to me to make sense of all of these provisions. That would make sense to me, too. I—I—I— Well, then it seems to me, if that's so, I gather the—your position would be that the district court erred in applying the 5 percent rate during the bankruptcy period. Yeah, that—that would be our position, yes, sir. We—we would contend that— It stays that forever. That is correct. And—and to add to that, Your Honor, to give—make a little more personal, these are individuals. The—Mr. Hancock, of course, they owned the house, they sold it, they—he retired, they moved to Arizona, and he's attempted to create a stream of income. So it's—it was very important to him that he got this right. So this is not a—just a forum promissory note. It was bargained for. It was considered. Everything was anticipated. The risk, which turned out to be a very valid risk, since the payments were not made, and eventually a bankruptcy was filed. So, yes, I—it's my contention that Judge Warren in the bankruptcy court had, in my opinion, the—the right decision in regards to that. Once that—that term was—the interest rate increased, which is not in contention, that's the end of it, because that's what it was bargained for, and that's what the term of the promissory note says. Did I answer your question? I'm— Yeah. Okay. And—and again— I think the bankruptcy court's position was the—the more consistent throughout. In my opinion, yes. And, again, I—I—it's really a pretty simple, very restrictive procedure. What he was doing was just enforcing the contract. Yes, sir. In the petition— Yes, sir. —they were just enforcing the contract. That's my opinion, yes, sir. And—and I—I really don't have anything to add to that. Now, I'm sharing time with a Chapter 13 trustee who lives with this day in and day out, and I would defer to him and give him some of my time, because he would be more familiar with the actual working this out. But, yes, that's exactly what I would say. But, I mean, the thing that concerns me about this is, you know, you want an economy that works in the sense that—that people who make their payments get the advantage of a low interest rate. And—and people who default on their payments, they can continue to make their payments, but there's a consequence to the default if the contract is negotiated that way. And if you—if you don't allow mortgage lenders— one of the problems with the mortgage market is that it—it—it can—it can freeze up, and you—you—you can't get mortgages. And if you—if you don't permit this rise in the interest rate in the—in the event of a default, that forces creditors in the position of covering that risk with a higher rate on the front end. Yes, sir. And that's not going to redound to the benefit of the—of potential debtors. And responsible—people who make a responsible schedule of payments will be disadvantaged. I—I—I totally agree with you, Your Honor. This, of course, is—they're individuals in this case, but the general proposition, you're exactly right. For the consumer and the general population, of course, that's correct. Did your client ever, you know, in writing, accelerate the loan in August? No, sir, he did not. He— All he did was file a foreclosure. Yes, sir. He—well— How could you foreclose without accelerating? Well, I would say, to answer that question, I think— The bankruptcy court said he accelerated. Yes, sir. As a matter—he never sent a piece of any sort of communication saying, I hereby accelerate the loan. How could he foreclose? Well, he would say he's foreclosing because the payments are substantially in default. They haven't been paid in months, and that was the—under North Carolina state law, that's a sort—that's justification to authorize the sale. So he used the second part of it where it says he could either accelerate or pursue any rights available under North Carolina law, and that was the foreclosure? Right. But, frankly, Mr. Ham— Don't you have to declare the whole debt due before you foreclose? Well, I would—I would say by just the fact the foreclosing, in effect, accelerates the debt. But, again, Mr. Ham— What did the bankruptcy court rely on when he—when the court said that the note was accelerated? I'm not sure, Your Honor. I mean, I was—I don't know what—how the judge reached that determination. Because, again, there was no— Well, he made it probably of necessity, because otherwise we really have a peculiar animal here. Well, again, I can't tell you what—why the judge found that, except there might have been some evidence that came in at that time, or maybe I just don't recall it in the statement. But Mr. Hancock was not present. There was no— The whole notion of deceleration is meaningless in the court here if we're—if it wasn't accelerated. I'm assuming it was accelerated and had to be. Right. But if it wasn't, as it conclusively wasn't, the foreclosure proceeding is probably a nullity, and the cure by deceleration doesn't make any sense. Well, if—then that puts you back in the situation you were in before foreclosure. That means the loan is substantially in default, and here we go again with, okay, we accelerate this time and we foreclose, and I don't know what could be achieved by that. Well, I understand, but I— Well, Mr. Hancock, these are individuals, and I frankly do not know if he sent a formal notification that this loan is hereby accelerated. There's certainly nothing in the record that says he did. I don't—not to my knowledge. Except the bankruptcy court's finding. Yes, sir. And surely he based that upon something. I just don't recall what that was. And again, Mr. Logan was there. He lives and breathes this, and I think he could probably answer your question a little more intelligently, but that's my recollection. Good morning, Your Honors. May it please the Court, I'm John Logan, the Chapter 13 trustee in this case. And Judge Wilkinson, I think you hit the nail on the head. Mr. Walker's argument, as I see it, reads Section B-5 as being subordinate to B-3, and it's not written that way. We have to read them in a way that honors both. And if this Court were to follow his argument, then I think that would do injustice and violence to the Court's decision in the landmark financial services versus Hall case, where the Court said, you've got to look at the contract as it stood at the time the bankruptcy was filed. If you don't do that, and if the Court were to follow Mr. Walker— being made here—is that, sure, the contracts all provide for default, and one way to have gone under default in April would have been to accelerate and foreclose. The other way is to raise the interest rate, and that's what was done at that point in time. The interest rate, though, was a product of default. And so, if you are going to go pre-default, I think that's the argument, then you have to go back before the interest rate hike, which was based on default. And my reading of it is that they did agree to go to the 7% under the— and that fulfilled the contract, and then the contract now, according to its terms, the payments had to be 7%. Then, when that wasn't complied with, there was acceleration and foreclosure. And I personally can't understand why the District Court imposed the 5% during the bankruptcy period. Do you know why? I don't, and that's actually why I'm here. I didn't participate in the District Court argument, because I didn't see that I had a dog in the fight. But when the District Court made that decision, I thought, there's no basis for this. I've got to stand up and speak on it. And were the court to follow Mr. Walker's argument, and were I a holder of a mortgage like this one, faced with what Mr. Hancock was faced with on June 1st, when he wrote the email and said, okay, I told you in May I'm going to work with you. You haven't paid me April. You haven't paid me May. It's now June 1. You're at the 7% rate. I would say, were you to follow Mr. Walker, well, I'm just assuming a lot more risk if I increase the rate, because under the Anderson versus Hancock decision, if he goes into bankruptcy, he can basically rewrite our agreement all the way to the beginning. I might as well foreclose now and try and sell my property to somebody else who's going to pay me. So, it seems to me that bankruptcy court got it right. I think they did. And it honors basically the benefit of the bargain. If you think of another hypothetical, let's say that the parties agreed that we're going to start this loan at prime. And over the course of this 30-year loan, if you default, I can either foreclose each time. I can either foreclose or I can raise the rate by 1%. And let's say we go 10 years and we're up to prime plus 4. And they default again. And I go to prime plus 5. And then Mr. Anderson and Ms. Jernigan file bankruptcy. Are we really going to reset the clock all the way back to 11 years before at the original just prime rate? With your colleague here, I was trying to point out that if, under my hypothetical, they paid the higher rate for 10 years, there could not be a foreclosure at that point. The contract has been changed by increasing the rate from 5% to 7%. And both parties would have gotten the benefit of their bargain. The lender would have gotten a higher rate. The buyer gets the opportunity to continue performing and to end up with the house, yes, I had to pay a higher rate, but at least it didn't get foreclosed. His argument is the default that gave rise to the interest rate increase should be treated as the same default that gave rise to foreclosure. And therefore, under the statute, you go back before the default and reconstitute. But the problem is that the first default was not a foreclosure or an acceleration default. The first default was a contract increase of interest rates. And that was written into the contract. And that was, as Judge Wilkinson points out, that's a contractual term that shouldn't be modified. And that's exactly the point that I made in my brief. That, as Judge Wilkinson said, this is a way of benefiting the borrower community. Otherwise, lenders are going to say, well, we'll set a rate. And if you don't pay, we're done. We're going to foreclose. Because if I give you another chance, even at a higher rate. I mean, all sorts of draconian consequences follow from this. First of all, the fact you're going to set the higher rate at the beginning of the contract if you can't raise it later on. And the other thing is, you have these, as Judge Niemeyer points out, these two remedies. You can either, the creditor has two remedies. One is to accelerate and foreclose. And the other is to raise the interest rate. Well, if you say, we're not sure we're going to be able to raise the interest rate to cover the risk, you're going to push creditors into foreclosure proceedings. And that's harsh. Exactly. I mean, that's draconian. You don't want to push the creditor community into higher interest rates at the outset and into acceleration and foreclosure in the event of default. This doesn't benefit the debtor community. It hurts them. It's like saying to the lender, you're stuck with a double risk if you keep going. You might as well cut your losses and just foreclose, like you say. It shuts down the lending community. It doesn't encourage commerce to continue with a measurement of the risk at the beginning. So I think that pretty much sums it up. Again, I don't see any reason for the district court's change of the rate to 5% at the petition date, the December date. It's inherently inconsistent with the way the court came out, because the court is looking behind the April default to get back to the 5% for some reason, and then reinstating the 7% default post-petition. The pre-petition action was a contractual action. That's correct. And the effective date of the plan was not when the December payments were to start. The effective date of the plan was when the court confirmed the plan on September 5. That doesn't change the fact that under the new contract that the plan created, the trustee was going to start making the first payments on the maintained loan for December. And the reason for that is when a debtor files, and the 341 meeting has to be held within 20 to 50 days of the petition date, if it's on the 50th day, you're already past the first day that the post-petition payment would be due under the mortgage, which the trustee cannot disperse absent an adequate protection order until the plan is confirmed. The bankruptcy court's ruling has, it seems to me, two benefits. Number one, it preserves the integrity of the contract. And number two, it correctly devised and designed and took account of all the different sections of 1322B. It harmonized the relevant subsections of 1322B. And so you get a ruling here, it's really quite artfully done, that both preserves contractual integrity and statutory interplay. And also, I mean, there's always an inclination in the case, you know, you want to do something good for somebody and everything, but sometimes there can be very harsh unintended consequences. I mean, I would love it if we lived in a world where it could be 5% interest and that would be fine, but there can be unintended consequences to these things because of the way in which economic incentives and financial incentives operate. And that's what you want to do. You just don't want really harsh consequences to flow from what we do up here. That's exactly right. There's one other thing about this case that's somewhat unique based on it being in the Eastern District. And that really doesn't have much bearing on the decision, but I wanted to point out in our district, I think we're the only one in the country where the Chapter 13 trustee files a motion for confirmation. And basically in doing that, my job is to tee up the case for all the parties to say, are we going to object to this? Are we going to agree to it? I'm not really a proponent of the debtor's position at that point. What I see my role is, is if the debtor has a colorable argument or plausible reason to propose a plan the way they do, and only debtors can propose plans, I'll tee it up, let the creditor object if they don't agree. Motion to show cause, so to speak. In essence. And the other reason for that is that if there is some way in which the debtor's plan is proposed, which never happens with Mr. Walker and his firm, doesn't work within the code, in the alternative to my filing a motion to dismiss, I can propose in my motion for confirmation a slight alternative that then honors the code, but still does what the debtor's trying to achieve. So that's kind of why we use that process. Was there any formal writing accelerating the debt in August? There was not. The only thing in the record about that is the email that Mr. Hancock sent to Mr. Anderson and Ms. Jernigan on June 1, to which, to the best of my recollection, there was no response. And he waited after that, hoping against all hopes that he would get paid in July or thereafter. And when that didn't happen come the end of August, he said, I don't have any alternative. I've got to go ahead and foreclose. And that, in essence, became the de facto acceleration of the debt. So, any other questions? We don't have any further questions. Thank you very much. We do thank you. Thank you. Mr. Walker? You know, I would like to respond to a few things I heard, which hopefully will clarify the position of Anderson and Jernigan. We're not saying that the interest rate can't be raised under the contract. We're not trying to wipe that term out of the contract. We're simply saying that as a consequence of default, the definition of a cure, as stated by this Court and other circuit courts of appeals, is that there is a reinstatement of the non-default status of the loan through the Chapter 13 plan. Now, in regards to the opinions of the courts below, the Bankruptcy Court relied heavily on the Supreme Court case of Nobleman v. American Savings Bank. In that case, a bifurcation of the loan was being attempted, where the debtors were trying to say that part of it would be unsecured and part of it would be secured. And the Supreme Court said, no, you can't do that. That's a fundamental alteration of the loan. The creditor asked for a completely secured loan, and that's what they get. Nobleman didn't talk about the definition of a cure. Nobleman didn't define a cure. It didn't talk about the parameters of a cure, what a cure means, what it does. So Nobleman isn't the case to follow. The case, I believe, to naturally apply is the Litton case. But one of the noteworthy things that Nobleman says is that a fundamental right that mortgage servicers have is a right to accelerate the loan upon default. And if a party was trying to take away that right, then that would be a modification that couldn't be done. But what happens in a cure when it comes to acceleration is a de-acceleration. And so you can have a right to something in a mortgage document which can't be modified but yet can still be cured. And so what we have here is a default interest rate that the Hancocks do have a right to when a default happens and they impose it, and we're not disputing that. We're not trying to say that, no, they can never do that. We're not trying to take that away from them. But we are just saying that there's a difference between the word modify and the word cure. And a right that cannot be modified can still be cured. That's what acceleration is. Acceleration is a right. You can't modify it by taking it away, but when acceleration happens, you can cure it by de-acceleration. What's your position on that hypothetical earlier, the prime plus one, next year prime plus two, prime plus three, prime plus five, and then I've had enough, we're going to foreclose. Does a cure go all the way back to prime? Well, there is a difference. I guess there's a yes and no and then you can explain. I'm sorry, there's a yes and a no. The difference is that when we're talking about these pre-petition arrears, and so whether that's what happened here with the increase from the 5% to the 7% or the prime plus one, prime plus one, all of that gets incorporated into the pre-petition arrears. That's paid in full through the Chapter 13 plan. The default interest rate, the prime plus one. You can maintain payments, but at the 7% rate. In other words, the contract explicitly addresses a payment amount and a payment interest rate. And when that payment has failed to be made, then there's acceleration in foreclosure. The question is, when the court goes back and decelerates and puts the parties back into where they're maintaining payments, is it maintaining payments now at the 5% or the 7%? And the 7% reflects the fact that somebody didn't make a payment and the risk is now higher. And you would be modifying that because you don't eliminate the default. The 7% is the product of that default and he elected not to foreclose. And so at that point, the payment is higher contractually to represent the risk. Now what would happen in the bankruptcy court went back before that. The court says, oh, there is no more risk. We're not going to go back. The court has to be saying, I'm going to reduce the seven to five under your position because there's no more risk. But it seems to me the character of that second paragraph isn't really a default remedy or a cure. What it really is, it's a change of the terms of the contract because of a manifestation of risk. And the manifestation of risk was the failure to make a payment. Now, the foreclosure and the acceleration, which is usually addressed in these types of cases, is the deceleration. And you got that benefit. Right? Right. As a curing fight is what is the size of the payment? That's the whole fight in this, right? Well, right. And also, what's the size of a cure? You're right, Judge Niemeyer, when you say that the 7% was a product of the default. Just in the same way that an acceleration of the loan would be a product of a default. All right. Thank you. Thank you, Your Honor. Thank you. We will come down and brief counsel. And we'll head into our final case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, David C. Norton